IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| RICHARD M. PINKERTON, | ) | |
| | ) | |
| Plaintiff, | ) | CV-05-6102-ST |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| COMMISSIONER, SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

STEWART, Magistrate Judge:

## **INTRODUCTION**

Pursuant to 42 USC § 405(g), plaintiff, Richard M. Pinkerton ("Pinkerton"), seeks judicial review of a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 USC §§ 401-433. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons discussed below, the Commissioner's decision is remanded for further proceedings.

## PROCEDURAL BACKGROUND

On February 21, 2002, Pinkerton filed an application for DIB, alleging disability since February 14, 2002, due to an unclassified degenerative bone disease, Gulf War Syndrome, a neurological disorder, post traumatic stress disorder ("PTSD"), and an inability to maintain motor skills.  Tr. 149-51, 168-77.[1]  Pinkerton earned sufficient quarters of coverage to remain insured through December 31, 2005.  Tr. 133.

Pinkerton's application was denied initially and on reconsideration.  Tr. 134-39. Pursuant to Pinkerton's request, a hearing was held on June 5, 2003.  Tr. 43-132.  Pinkerton, his wife, and a vocational expert testified.

On February 27, 2004, Administrative Law Judge ("ALJ") James M. Caulfield issued a decision denying Pinkerton's request for DIB.  Tr. 11-28.  Pinkerton requested review of the ALJ's decision, which the Appeals Council denied on February 18, 2005.  Tr. 5-7.  Accordingly, the ALJ's decision became the final decision of the Commissioner.

## ALJ'S DECISION

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).

---

[1] Citations are to the page number of the transcript of the record filed with the Commissioner's Answer.

The Commissioner has established a five-step sequential process for determining whether a person is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR § 404.1520.

At step one, the ALJ found that Pinkerton had not engaged in substantial gainful activity since the alleged onset date. Tr. 14, 27 (Finding #2); 20 CFR § 404.1520(b).

At step two, the ALJ found that Pinkerton had the severe impairments of a personality disorder, mild carpal tunnel syndrome, and mild cervical spine degenerative disk disease. Tr. 15, 27 (Finding #3); 20 CFR § 404.1520(c). However, the ALJ found that Pinkerton's impairments were not severe enough to meet or equal a listed impairment. Tr. 15, 27 (Finding #4).

At step three, the Commissioner must assess the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 CFR §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96-8p. The ALJ determined that Pinkerton retained the RFC to read and perform medium work, including light and sedentary jobs, could maintain his hygiene and grooming, could understand, remember, and perform simple tasks, could perform more detailed tasks in which he had previous experience, could maintain a schedule and complete a normal workday and workweek, did not require special supervision, could make simple decisions, and had no problems with significant distractibility, but should not have a job with direct public contact. Tr. 27 (Finding #6).

At step four the Commissioner will find the claimant is not disabled if he or she retains the RFC to perform work he or she has done in the past. 20 CFR § 404.1520(e). The ALJ found

that Pinkerton was able to perform his past relevant work as a truck driver.  Tr. 28 (Findings #7 and #8).

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform other work that exists in the national economy.  *Yuckert*, 482 US at 141-42;  20 CFR § 404.1520(f).  The burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform.  *Yuckert*, 482 US at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999).  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR § 404.1566.  Although he found that Pinkerton could perform his past relevant work, the ALJ nonetheless proceeded to step five and made alternative findings.  Relying upon testimony from a vocational expert, the ALJ found that Pinkerton could perform a significant number of jobs existing in the national economy, specifically jobs as a a sweeper/cleaner, a bench assembler, and a sedentary assembler.  Tr. 28 (Finding #9).

## **STANDARD OF REVIEW**

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id* (citation omitted).

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986).  The Commissioner's decision must be upheld if it was based on proper legal standards, even if

the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F3d at 1039-40.

If substantial evidence supports the Commissioner's conclusion, the Commissioner must be

affirmed; "the court may not substitute its judgment for that of the Commissioner." *Edlund v.*

*Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).

## STATEMENT OF THE FACTS

### I. Pinkerton's History

#### A. Military Service

Pinkerton was born in 1967. Tr. 48, 149.[2]  He attended high school in Chiloquin,

Oregon, and enlisted in the National Guard in 1987. Tr. 51-52, 71.  After boot camp, he was

stationed in Minnesota in a maintenance battalion with an MOS (military occupational specialty)

of fire control instrument repair and truck driving. Tr. 53-54.  He served in the reserves from

1987 until late 1990. Tr. 68.

In January 1991, Pinkerton was called to active duty in Operation Desert Storm from a

reserve unit in Eugene, Oregon. Tr. 54-55, 63.  While overseas on active military duty,

Pinkerton drove supplies into Iraq from a dispatch center in Saudi Arabia. Tr. 59, 62.  While in

Iraq, Pinkerton was in a truck accident. Tr. 57.  His head hit the windshield and he became

unconscious. Tr. 69-70.  When he regained consciousness, he reported to the medical tent back

at his camp. Tr. 69.  He was kept off duty for about two days and given painkillers for a

headache and pain in his neck. Tr. 70.  The injuries Pinkerton sustained in this accident appear

to form the basis of Pinkerton's assertion of debilitating orthopedic complaints.

---

[2] In accordance with Local Rule 10.3(a)(3), only the relevant year is given.

Pinkerton alleges a number of other traumatic incidents that affected him while overseas, including witnessing the death of a soldier or soldiers killed by a landmine, coming under sniper fire, finding the bodies of dead Iraqis, and being exposed to an unknown toxic substance. These incidents are the basis of Pinkerton's assertion that he suffers from PTSD and an unspecified neurological disorder. In addition, also while overseas, Pinkerton spent about a week in psychological lockdown after receiving a "Dear John" letter from his girlfriend. Tr. 65-66.

**B.  Return from Active Military Duty and Initial Award of DIB**

Pinkerton returned from overseas in April 1991. In response to questions on a Southwest Asia Demobilization/Redeployment Medical Evaluation form, completed on April 24, 1991, Pinkerton answered "Yes" to a question asking whether he had "had any nightmares or trouble sleeping" and answered "No" to questions asking whether he "had recurring thoughts about your experiences during Desert Shield / Desert Storm" and whether he had "reason to believe that you or any of your unit were exposed to chemical warfare or germ warfare." Tr. 923.

Between April 25 and May 3, 1991, Pinkerton was treated at medical, orthopedic, and neurology facilities in Fort Hood, Texas, for dizziness, light-headedness, and headaches that he had been experiencing since his driving accident in Iraq. Tr. 910-22. On May 3, 1991, neurologist Dr. Peter W. Pick diagnosed mild musculoskeletal neck and superior thoracic back pain and mild post-traumatic headaches due to a closed head injury, as well as dizziness due to minimal orthostatic hypotension. Tr. 912. Dr. Pick prescribed pain medications, advised Pinkerton to increase his fluid intake, and advised that Pinkerton could be out-processed from Fort Hood and released to his unit in Oregon. *Id*.

Pinkerton was honorably discharged from active military service on May 18, 1991, as a Private First Class at the rank of E3.  Tr. 167.  He was credited with two months and 27 days of foreign service.  *Id*.[3]

After his discharge from active military service, Pinkerton held a series of jobs as a truck driver.  While working as a truck driver in Springfield in mid-August 1991, Pinkerton was admitted to the VA Medical Center ("VAMC") in Roseburg.  Tr. 907.  At that time, he was extremely tense, anxious, verbalizing significant suicidal and homicidal ideation, and relating severe adjustment problems since returning from Army duty in Iraq.  *Id*.  Pinkerton was apparently admitted to the Roseburg VA Medical Center for over two weeks.  Tr. 892-94.

A few weeks later, Pinkerton was again admitted to the VAMC after being in a motor vehicle accident and then running from the police because he thought they were "after him" and hiding in a tree to avoid a confrontation.  Tr. 900.  He complained of chest pain over the preceding four months and depression.  Tr. 900-01.  Following those admissions, Pinkerton was apparently unable to obtain a work release and was fired from his truck driving job.  Tr. 894. His discharge diagnosis on September 2, 1991, was of adjustment disorder with anxiety and depression, rule out PTSD.  Tr. 892, 897 & 900.

A few weeks later, on September 19, 1991, Pinkerton was seen by a VAMC staff psychiatrist, Dr. Erik Fisher, complaining of an increase in anxiety, panic attacks, acute PTSD symptoms of nightmares and flashbacks with severe sleep disturbance, and an increase in violence.  Tr. 892-96.  Dr. Fisher diagnosed probable acute PTSD and Panic Disorder, prescribed

---

[3] Although Pinkerton testified that his military obligations ended upon that separation (Tr. 67-68), the DD Form 214 evidencing that separation notes a reserve obligation termination date of September 24, 1995.  Tr. 167.

medications to reduce the panic attacks, improve sleep, and decrease the nightmares, and arranged for a follow up appointment in two weeks.  Tr. 895-96.

In a February 8, 1993 Application for Compensation or Pension through the Department of Veterans Affairs, Pinkerton alleged a heart condition commencing March 1, 1991, a neck injury on April 6, 1991, a broken front tooth on May 28, 1991, and a mental disorder.  Tr. 313. This application resulted in a series of medical and mental evaluations.

On June 7, 1993, Pinkerton was examined by Dr. Clarence Carnahan regarding his alleged mental disorder (Tr. 842-45) and by Dr. Francis L. Sult regarding his medical condition (Tr. 846-49).  Dr. Carnahan reviewed Pinkerton's C-file which "contained nothing clinical," noting Pinkerton's two 1991 admissions to the Psychiatric Unit, one lasting eight days and one lasting two days.  Tr. 842.  He also reviewed Dr. Fisher's notes from September 1991.  *Id*. Dr. Carnahan diagnosed intermittent explosive disorder, but had insufficient evidence to diagnose Pinkerton with PTSD.  Tr. 844.  He also noted that further neurological evaluation would be necessary to rule out a neurological disorder because Pinkerton had "give[n] the history of breathing corrosive dust when in Iraq and says that this made him sick."  *Id*.  Dr. Sult diagnosed "[m]yoclonic jerking of the head and neck, etiology undetermined [and] [c]hest pain, relieved by nitroglycerin, etiology undetermined."  Tr. 848.

On June 14, 1993, Pinkerton underwent a neurological evaluation by Dr. C. Stephen Patterson.  Tr. 839-41.  Dr. Patterson noted that Pinkerton's description of the accident in Iraq "is not terribly consistent" in that Pinkerton first stated that "he heard everything go crunch from the top of his neck down to between his shoulder blades" and later stated that he "was knocked out at the time of impact."  Tr. 839.  Pinkerton reported "involuntary jerking and nodding of his

head" since the injury which Dr. Patterson described as "intermittent, brief, single isolated nodding jerks of his head in an AP direction [which are] more prominent when being questioned about it and less prominent when distracted."  Tr. 841.  Dr. Patterson's impression was "[n]odding movements of the head following an MVA – doubt organic neurologic etiology."  *Id.*

On October 9, 1993, Dr. Mary-Lynn Theel, a psychiatrist, performed a mental health examination of Pinkerton.  Tr. 797-800.  At that time, Pinkerton was "experiencing classic symptoms of severe post traumatic stress disorder," but had not been adequately treated for that condition and was "'on the edge' of decompensating if he does not get fairly significant intervention for his symptoms."  Tr. 799-800.  She diagnosed Pinkerton with PTSD, severe, and Major Depression, Severe.  Tr. 800.  She also assigned a Global Assessment of Functioning ("GAF") of 20/40.[4]  *Id.*  Dr. Theel opined that it was "difficult to see how Mr. Pinkerton could stand up to the stress of working eight-hours a day, 40-hours a week, especially in his given profession of truck driving."  Tr. 800.  She also noted that at that time, "he would not be able to respond well to supervision given his level of irritability and he would not be able to adapt well to changes in the work environment, nor could he sustain an adequate persistence and pace."  Tr. 800.

On January 18, 1994, Dr. Irwin H. Noparstak performed a psychiatric evaluation of Pinkerton.  Tr. 786-94.  At that time, Pinkerton "seemed very angry but also very on guard, and

---

[4]  A GAF score between 31 and 40 indicates "Some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relationships, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant to home, and is failing at school)."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th Ed.) ("DSM-VI"), p. 32.

ready to spring."  Tr. 786.  Pinkerton recounted developing emotional problems after returning

from overseas service, becoming "enraged with everyone and everything" and having "anger

outbursts frequently."  Tr. 787 & 789.  His anger problems caused him difficulty on the job,

although he was able at that time to perform work as a truck driver if he "was left alone and had

minim[al] people contact."  Tr. 787.  However, after he went to the VA seeking treatment for

dizziness and chest pains, the VA notified the DMV, and his commercial drivers' licence was

revoked, meaning that he could no longer drive commercial vehicles.  Tr. 787, 894.

Dr. Noparstak diagnosed severe PTSD and opined that Pinkerton was "severely disabled

vocationally [and] socially" and was at a 50-100% disability level, "[u]sing VA criteria."

Tr. 794.  Dr. Noparstak also noted that he did not think medications would help and that

Pinkerton needed psychotherapy, but with his "poor ego skills . . . he may not be able to utilize

[outpatient psychotherapy]."  *Id*.  Dr. Noparstak felt the "only thing that will really help

[Pinkerton] was inpatient psychotherapy."  *Id*.

On October 24, 1996, Pinkerton was examined by Rex W. Turner, Ph.D., a VA clinical

psychologist.  Tr. 445, 742.  Dr. Turner noted that Pinkerton's motor behavior was lethargic, that

he made no eye contact, that his ability to respond meaningfully and provide data was erratic,

that his thinking appeared quite confused, and that his judgment had been poor for years.

Tr. 745.  He concluded that Pinkerton did not have PTSD, but rather "a long-standing personality

disorder which causes him significant psychological distress and disposes him to anger

outbursts, anxiety and depression."  *Id*.  Dr. Turner diagnosed alcohol abuse, continuous mild to

moderate, and paranoid personality disorder with antisocial features, with a GAF of 33.  Tr. 746.

On December 2, 1996, Dr. Joel Daven, a neurologist, examined Pinkerton and found no underlying neurologic cause for his symptoms.  Tr. 327.

In the 15 years prior to the hearing, Pinkerton alternated between driving trucks and working as a carpenter.  Tr. 77-78.  Pinkerton was granted DIB benefits by the SSA some time in 1996, based on the onset of a disability on June 8, 1993, and did not work between March 1996 and September 1997.  Tr. 16 & 319.

### C.  Resumption of Work and Termination of Benefits

In September 1997, Pinkerton resumed work as a truck driver (Tr. 435) and again held a series of jobs, most lasting fewer than six months, and all of which Pinkerton contends he quit or was fired from due to medical reasons.  Tr. 319.  In October 2000, his DIB benefits were terminated due to his resumption of working.  Tr. 16.

### D.  Medical and Mental Treatment Prior to Stopping Work in 2002

On December 3, 2001, Pinkerton was seen at the Roseburg VAMC complaining of a 10 year history of chronic pain in his neck and "chronic pain and ongoing persistent weakness in [his] arms, legs, hands, [and] shoulders."  Tr. 419.  Pinkerton reported being able to lift less weight less frequently, and being unable to torque the load on his truck without taking a break between doing each side.  *Id.*  He also reported occasional "sensation[s] of dizziness" and experiences of a "head 'shock'" if he stopped taking his Zoloft.  Tr. 420.  The treating doctor assessed chronic neck pain and "anger," ordered an X-ray of Pinkerton's cervical spine, planned to review his medical record, and considered sending Pinkerton to the anesthesia clinic and prescribing long acting opoids.  Tr. 420.

11 - OPINION AND ORDER

A week later, on December 10, 2001, Pinkerton called the VAMC again reporting chronic pain in his joints, shoulder, elbows, hips, and knees, and noting that the nature of the pain had changed over the past four to six weeks, becoming like a "vise grip in nature and sometimes has a sharp pain 'like a nail stuck into joint.'" Tr. 411. He stated that this pain was "associated with loss of strength and ability to use [his] extremity," which occurred without warning and lasted from 5-15 minutes. *Id*. An X-ray of Pinkerton's cervical spine on December 21, 2001, revealed "very minimal disk disease from C4 to C7." Tr. 417.

Pinkerton again called the VAMC on January 7, 2002, reporting increasing pain and increasing weakness and loss of strength to his shoulders, arms, and hips. Tr. 411. He stated that the pain was worse than at his last visit, and reported being frightened to drive because he had nearly had an accident when he had lost strength in his arm and had to place his chest against the steering wheel to correct the truck he was driving. *Id*. On February 2, 2002, he was seen in the VAMC, reporting episodic left upper and lower extremity weakness and numbness, which had caused him to drop items and limp. Dr. Gary L. Glasser noted possible left upper and lower extremity radiculopathy, chronic neck pain, left hip pain, unexplained positive Rhomberg, and considered that Pinkerton might have a central nervous system structural lesion. Tr. 410. He ordered MRI scans of Pinkerton's head and cervical spine, an EMG, and X-rays of Pinkerton's left shoulder and hip.

On February 12, 2002, Pinkerton again reported pain in his arms, shoulders, and knees, and loss of strength in his limbs which he felt was making it dangerous for him to drive. Tr. 407, 409. His episodic spells were happening more frequently and lasting longer, and he was also experiencing difficulty concentrating, occasional balance problems, and feelings of depression.

Tr. 409.  He was referred to medical triage to assess the pain, and prescribed Wellbutrin along

with a gradual decrease in his Zoloft.  Tr. 409.  Two days later, Pinkerton ceased working as a

truck driver.  Pinkerton testified that he was let go because he could not longer push the clutch in

with his leg and had been involved in two "near accidents."  Tr. 76.

### E.  Medical and Mental Treatment Since Onset of Disability in February 2002

On February 19, 2002, Pinkerton reported continuing pain in his joints, as well as an

associated loss of strength.  Tr. 406.  He was having difficulty sleeping due to the pain and was

concerned that he was dying.  Tr. 406-07.  The following day, he reported that he could no

longer tolerate the pain and wanted to go ahead and take the narcotics despite the possible side

effects.  When he was told of possible arthritis in his neck, he became distraught, fell back on to

the exam table, became flushed, and nearly wept, asking:  "How am I going to drive my truck,

they will pull my license and how long do I have to live now?"  Tr. 406.

On April 10, 2002, Pinkerton underwent a neurological evaluation by Dr. Linda Bufton,

M.D., Ph.D.  Tr. 374-75.  Dr. Bufton wrote that Pinkerton's exam didn't "ring true," found his

sensory loss "nonanatomic," and recommended a neuropsychiatric evaluation.  Tr. 375.

On April 30, 2002, psychologist David E. Mace, Ed.D. performed a psychological

evaluation of Pinkerton, administering a Wide Range Achievement Test - 3 ("WRAT-3") and a

Minnesota Multiphasic Personality Inventory - 2 ("MMPI-2"), and reviewing Pinkerton's VA

disability report file.  Tr. 376-80.  Dr. Mace noted that Pinkerton had "no overt sign of a thought

disorder during the interview, but he did discuss a history of [acute onset] paranoid episodes."

Tr. 376.  He indicated that Pinkerton's symptom patterns would need further verification, but

"certainly fit into a working diagnosis of Posttraumatic Stress Disorder (DSM IV 309.81) as well

as a Cognitive Disorder NOS - provisional (294.9)." Tr. 379. Dr. Mace also disagreed that Pinkerton's symptom patterns were due to a Borderline Personality Disorder since "that is only likely if the other issues are ruled out, which does not seem to be the case at this point." Tr. 380.

Medically, Pinkerton presented with neck pains and stiffness, sharp pains in his lower back and legs, and reported a history of ulcers and incidents of fecal incontinence during the previous six years, as well as enuresis during the past 10 years. Tr. 376. Dr. Mace noted an impairment in Pinkerton's gross motor skills (walking) and opined that there were some apparent but as yet unclarified "neuromuscular deficits that he presents as varying from his walking with the aid of a cane to being in a wheelchair." Tr. 377.

Pinkerton told Dr. Mace that he wanted to get back to working as a long haul truck driver. Tr. 376-77. Pinkerton had "some difficulty in relating to some of his employers but was never fired," but had last driven a truck in February 2002, when he was let go for safety reasons because he had lost sufficient arm strength to handle the clutch and steering. Tr. 379. Pinkerton also reported weak legs and told Dr. Mace that he spent some days in a wheelchair. *Id*.

Dr. Mace noted that Pinkerton's "atypical" medical problems indicated a need for further medical reviews to determine how the medical issues relate to mental health issues. Tr. 378. In addition, Pinkerton's progressive neuromuscular deterioration over the past 10 years needed further review by a neurologist. Tr. 380. Dr. Mace concluded that a "fuller screening of medical, neurological, and neuropsychological as well as behavior would need to be done in order to differentiate possibilities" and that it was "hard to say what the progression of this disorder or set of disorders will be at this time." Tr. 380.

On May 15, 2002, Pinkerton reported he was finding it physically difficult to do anything and was experiencing dizziness, "body shocks," inability to talk, and isolating and "explosive" behavior when trying to reduce his intake of Zoloft. Tr. 401. The nurse practitioner who saw him assessed depression, paranoid personality, and Borderline Personality Disorder, advised him to continue to try and taper his Zoloft and take Wellbutrin, and to call as needed regarding medication or mood concerns. Tr. 401-02.

On May 27, 2002, Pinkerton was admitted overnight at the hospital after drinking alcohol, attempting suicide by slicing his throat with a knife, and then being taken to the emergency room by the police. Tr. 392-95. After receiving treatment, he was discharged to follow up with his regular physician and told to avoid alcohol use and to return to the emergency room for any thoughts of self-harm. Tr. 394-95.

On May 30, 2002, Pinkerton again saw Dr. Glasser, reporting the recent hospitalization and also describing pain and weakness in his left anterior thigh which had caused him to fall a week prior and several times in the past. Tr. 398. Dr. Glasser made no definitive diagnosis, but suggested radiculopathy and "anxiety PTSD." Tr. 398.

On June 13, 2002, Pinkerton called the VA's psychiatric unit in Eugene, reporting that he had stopped taking Zoloft and that he was no longer able to tell when he was going to get angry and that he "just explodes." Tr. 398. His dosage of Wellbutrin was increased and he was advised to seek alcohol treatment. *Id.* On July 3, 2002, Dr. Glasser assessed Pinkerton with cervical and lumbar radiculopathy and PTSD.

Pinkerton met with an addictions therapist and attended Dual Diagnosis Group therapy in July and October 2002.  Tr. 654-58, 690-91.  Although that therapy appeared to be useful, it not clear when or why it was discontinued.

Dr. Glasser advised Pinkerton on December 17, 2002, that he "had been unable to substantiate anything beyond carpel tunnel syndrome and psychiatric problems including depression and personality disorder and so must consider somatization disorder."[5]  Tr. 689.  Pinkerton became angry and left the exam room.  *Id.*

On January 1, 2003, David Northway, Ph.D., performed a psychodiagnostic assessment on Pinkerton.  Tr. 697-704.  Dr. Northway found Pinkerton's "level of honesty and forthrightness . . . difficult to determine."  Tr. 697.  He found marked limitations in Pinkerton's ability to interact with the public and supervisors and diagnosed PTSD, rule out cognitive disorder NOS, with uncertain etiology, Pain Disorder[6] associated with psychological factors and general medical condition, and assessed Pinkerton a GAF of 50.  Tr. 702 & 704.  He "strongly recommended" a "more thorough neuropsychological evaluation," including "administration of validity measures and a personality measure."  Tr. 701.

---

[5]  The essential feature of Somatization Disorder is a pattern of recurring, multiple, clinically significant somatic complaints.  A somatic complaint is considered to be clinically significant if it results in medical treatment or causes significant impairment in social, occupational, or other important areas of functioning.  The multiple somatic complaints cannot be fully explained by any known general medical condition or the direct effects of a substance.  If they occur in the presence of a general medical condition, the physical complaints or resulting social or occupational impairment are in excess of what would be expected from the history, physical examination, or laboratory tests.  The unexplained symptoms in Somatization Disorder are not intentionally feigned or produced.  DSM-IV, p. 446.

[6]  The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention.  The pain causes significant distress or impairment in social, occupational, or other important areas of functioning.  Psychological factors are judged to play a significant role in the onset, severity, exacerbation or maintenance of the pain.  The pain is not intentionally produced or feigned as in Factitious Disorder or Malingering.  Laboratory tests may reveal pathology that is associated with the pain.  DSM-IV, p. 458.

On March 11, 2003, Willima Lussier, a Physician's Assistant, performed a C&P orthopedic exam. Tr. 983. He noted that Pinkerton used a cane to ambulate and his gait had a prominent tilt to the right. Tr. 984. Pinkerton demonstrated hesitation and difficulty moving himself into and out of a chair and displayed "exceedingly hyperesthetic tenderness to palpation" over the area of C2-3 and extreme pain with all attempts to measure range of motion of the cervical spine "even to the point of experienceing a hyperventilation episode and near syncope, which forced the examiner to delay further evaluation and for the veteran to essentially beg, with tears in his eyes, to be further evaluated." Tr. 985. Lussier diagnosed a "probable psychosomatic disorder without objective evidence of Orthopeodic or Neurologic disorder." Tr. 990.

On March 17, 2003, Dr. Turner reviewed Pinkerton's medical and psychiatric records and opined that he perceived Pinkerton's "overall psychiatric symptoms . . . as severe" and his "psychosocial and functional status . . . as extremely marginal." Tr. 1033 & 1035. Dr. Turner administered a mental status examination (Folstein MMSE), on which Pinkerton obtained 23 of 30 possible points and placed him in the "lowest decile of functioning." Tr. 1035. His "[t]hought processes were very clouded" and frequently included "indications that he did not understand [Dr. Turner's] questions." Tr. 1035-36. Pinkerton's psychosocial functioning was "best described as severely compromised. [Pinkerton] appears to be able to obtain employment in trucking, UNABLE to retain it long term." Tr. 1036 (emphasis in original). Among other things, Dr. Turner diagnosed severe recurrent depressive disorder, interpersonal problems and marital dysfunction, reports of moderate to severe PTSD (conditioned upon verification of

stressors from Gulf War), a continuous and severe history of alcohol dependence in claimed

remission, and a mixed personality disorder.  Tr. 1037.

Pinkerton was seen on April 3, 2003, by Dr. William B. Mittchell who opined that:

> Mr. Pinkerton represents a combination of significant problems,
> some of which are probably related to his Gulf War exposure. . . .
>
> The explosive nature of his personality would be totally consistent
> with closed head injury syndrome but there is not much
> documentation to support such an injury.  But, it is also totally
> consistent with chronic addictive disorder.  Even though Mr.
> Pinkerton has not had any alcohol now for nearly a year, his
> intolerance to any deviation from his expectations is consistent
> with ongoing addictive disorder with all of its obsessive
> characteristics.
>
> The degree to which [PTSD] fits into all of this is complex and
> unclear.  This lack of clarity is contributed to by other types of
> personality disorder that have been suggested through his
> background treatment exposures.  His multiple somatic complaints
> appear to be largely unsubstantiated and probably reflect emotional
> issues.

Tr. 1039.

## II.  <u>VE Testimony</u>

At the June 5, 2003 hearing, vocational expert ("VE") Patricia C. Lesh testified.  Tr. 118-

32.  The VE indicated that Pinkerton's past relevant work included jobs as a construction worker

(heavy, semi-skilled, SVP of 4) and a truck driver (medium, semi-skilled, SVP of 4), but without

any transferrable skills.  Tr. 119-20.

The ALJ posed a hypothetical question to the VE, asking her to assume the claimant was

35 years old, has a GED, could perform the demands of medium work, could understand,

remember and perform simple tasks involving up to three steps – and more detailed tasks if he

18 - OPINION AND ORDER

had experience with those tasks – who was able to maintain a schedule and complete a normal work day and work week, did not require special supervision, could make simple decisions and has no difficulty with significant distractability.  Tr. 120.  The ALJ also specified that the hypothetical claimant was to have no direct public contact but could have occasional incidental public contact, and was able to maintain hygiene and grooming.  Tr. 121.

In response, the VE testified that the construction worker job was eliminated, but that this hypothetical person may be able to do the truck driving job, depending upon the amount of public contact.  Tr. 121.  In addition, those restrictions allowed work at 25% of the sweeper/cleaner jobs (those being the jobs where the "business would be completely empty") (Tr. 121) and as a sedentary assembler.  Tr. 121-22.

The ALJ then asked the VE to assume that the claimant also had "any and all concrete limitations to which the Claimant has testified."  Tr. 123.  The VE testified that if the claimant could sit for only two or three hours, this would eliminate all the jobs she had previously identified, but that if he could resume activity, it would allow him to perform the sedendary or bench assembly jobs.  Tr. 124-25.

Pinkerton's attorney questioned the VE concerning what effect additional psychological limitations would have on employment.  If the claimant were "ranting and raving" and not on task all day, it would eliminate all jobs.  Tr. 127-28.  Additionally, if he were not on task for upwards of two to three hours, then "any job would be jeopardized."  Tr. 129.  The effect that shorter periods of explosive behavior would have on a job largely depended upon the type of job and employer.  Tr. 127 & 129.  Finally, if there were a marked limitation on the claimant's abilities to interact appropriately with the general public, to accept instructions and respond

appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, then "all jobs" would be affected.  Tr. 131-32.

## DISCUSSION

Pinkerton challenges the ALJ's rejection of his testimony, the testimony of his wife, and the opinions of examining providers.   He also challenges the ALJ's conclusions at Steps Four and Five of the disability evaluation process.  For the reasons that follow, this court finds that the ALJ erred by rejecting the testimony of Pinkerton, his wife, and the examining providers, and, therefore, did not meet his burden at Step Five.

## I.  Rejection of Lay Testimony and Examining Physician Opinions

### A.  Lay Testimony

#### 1.  Legal Standard

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of symptoms.  *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996).  The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so.  *Id* at 1283; *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993).  It is not sufficient for the ALJ to make a general assertion that a claimant is not credible.  The ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill*, 12 F3d at 918; *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995); *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998).

When making a credibility evaluation, the ALJ may consider objective medical evidence together with the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment other than medication; measures used to relieve symptoms; and functional limitations caused by the symptoms. *Smolen*, 80 F3d at 1284; *see also* SSR 96-7p.

In addition, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. . . . The ALJ must also consider . . . the claimant's work record and the observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; functional restrictions caused by the symptoms; and the claimant's daily activities.

*Smolen*, 80 F3d at 1284 (citations omitted).

Friends and family members and others in a position to observe a claimant's symptoms and daily activities are also competent to testify as to the claimant's condition. *Dodrill,* 12 F3d at 918-19. Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*

///

///

///

### 2. **Analysis**

Pinkerton's request for DIB is premised upon both physical and mental impairments.

The ALJ found no objective evidence of any underlying impairment sufficient to support

Pinkerton's alleged physical impairments, explaining:

> Although the claimant alleges extreme pain and limitations in
> mobility, extensive testing has failed to reveal any neurologic or
> other physical cause for this extreme alleged incapacity.  While the
> claimant has some mild carpal tunnel syndrome and mild
> degenerative . . . changes of the cervical spine along with
> psychological limitations, there is no medically determinable
> impairment that could reasonably cause the extreme limitations he
> reports, including requiring the use of a wheelchair.

Tr. 23.

The ALJ also rejected Pinkerton's testimony insofar as it reflected limitations greater

than those reflected in the mental RFC findings of the state agency medical consultants dated

May 23, 2002 (as set forth at Exhibit 13F, page 3, Tr. 647):

> The [ALJ] accepts the mental residual functional capacity
> limitations set forth by the state agency medical consultants
> (Exhibit 13, page 3).  While the state agency apparently found no
> severe physical limitations, giving the claimant the benefit of the
> doubt, the [ALJ] concludes that the claimant can perform up to
> medium work, including sedentary and light jobs.  * * *  While
> the [ALJ] accepts that the claimant has the physical and mental
> limitations set forth above, to the extent he alleges greater
> limitations, these allegations are not accepted as the claimant has
> not credibly established the medical or factual basis for his alleged
> extreme physical and mental impairments.

Tr. 25-26.

Based on his rejection of Pinkerton's testimony of any limitations beyond those found by the state agency medical consultants, as well as his general assertion that Pinkerton was not credible based on various alleged inconsistencies in the record, the ALJ also rejected the testimony of Pinkerton's wife.  Tr. 25.

### a.  <u>Rejection of Pinkerton's Testimony</u>

At the hearing, Pinkerton testified that since his termination from his last job as a truck driver, he has been unable to work due to leg and neck pain which require him to alternate positions.  Tr.  79.  He drives approximately once a week to a drive-through store near his home (Tr. 51), can only stand for 15-20 minutes (Tr. 80), can only sit for two or three hours before experiencing pain to his hips and legs (Tr. 82), can only walk five to ten yards without a cane and 25 yards with a cane (Tr. 83-84), cannot lift 20 pounds while bending (Tr. 84), cannot lift a gallon of milk with his left hand (Tr. 85), and can exercise for only two minutes at best (Tr. 88). His wife has to help him get out of bed every morning.  Tr. 86.  His only household chores are doing the dishes or stirring the food.  Tr. 88.  He often experiences "explosions" of anger once or twice a day when he gets frustrated or cannot concentrate which makes other people afraid of him.  Tr. 103-04.  He has to read something three or four times in order to comprehend what he is reading.  Tr. 106.

The ALJ noted that Pinkerton had previously been granted benefits on a Title II application filed in July 1993, but that those benefits were terminated in October 2000 after Pinkerton returned to work.  Tr. 16.  The ALJ expressly declined to reopen the prior determination, but considered evidence prior to the current alleged disability onset date of February 14, 2002 by way of background.  *Id*.  The ALJ devoted over four pages of his opinion

detailing the records concerning Pinkerton's military service and medical and mental health treatment between April 1991 and June 1998, and over four additional pages carefully reviewing Pinkerton's medical treatment and mental health examinations between December 2001 and April 2003.

The record fully supports the ALJ's determination as to the absence of objective medical evidence of the physical impairments alleged by Pittman beginning in late 2001 which caused him to stop work in February 2002. Despite numerous tests, Dr. Glasser was unable to diagnose a cause for Pittman's multiple and serious physical symptoms and as of December 17, 2002, was "unable to substantiate anything beyond carpel tunnel syndrome and psychiatric problems including depression and personality disorder and so must consider somatization disorder." Tr. 689. Pinkerton was then examined by numerous mental health providers in 2002 and 2003.

The ALJ found that Pinkerton had a personality disorder, mild carpal tunnel syndrome and mild cervical spine degenerative disease, which were severe impairments, but which caused only a mild restriction in activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence or pace, and no episodes of decompensation. Tr. 15-16. He clearly did not accept that the severity of the either the physical or mental symptoms and limitations described by Pinkerton was attributable to PTSD or Gulf War Syndrome arising out of Pinkerton's military service between January and April 1991. The ALJ was troubled by Pinkerton's inability to remember the details of his service, including the details of his unit, names of commanding or non-commissioned officers, dates or locations of traumatic events, or the names of any personnel who may have witnessed those events. Tr. 16 & 24. Some of the ALJ's concern appears to have stemmed from his own military experiences and information

concerning the Gulf War.  Tr. 24, 52, 55-56, 58.  In addition, the ALJ pointed out that multiple examining providers have not diagnosed PTSD.  Tr. 18 (citing Tr. 536 (June 7, 1993 diagnosis by Dr. Clarence Carnaham of intermittent explosive disorder and note that there is "insufficient evidence to diagnose this as [PTSD]")), 19-20 (citing Tr. 445 & 742-46 (October 24, 1996 chart notes of Dr. Turner, stating that Pinkerton "does not appear to have [PTSD]" and that a variety of tests aimed at evaluating Pinkerton's claim of Gulf War Syndrome had all come up negative)), and 20 (citing Tr. 438-40 (December 17, 1996 chart note of social worker Carrie F. Jessie stating that there did "not appear to be sufficient evidence to reflect a diagnosis of PTSD")).

The ALJ's decision to reject Pinkerton's testimony concerning the wartime stressors he experienced is supported by substantial evidence in the record.  Pinkerton's description of those events has varied over time, and he submitted no documentary evidence or third-party statements to verify his accounts.  The rejection of Pinkerton's testimony, combined with the differing conclusions by examining mental health providers concerning whether his symptoms result from PTSD, support the ALJ's rejection of PTSD as the relevant diagnosis.

However, the record reveals that multiple treatment providers have diagnosed Pinkerton with a variety of other mental health problems, and several – including the most recent providers – have indicated that there is or may be a link between Pinkerton's mental health issues and his physical symptoms.  In 1996, Dr. Turner noted a "hysterical" quality to Pinkerton's physical complaints, suggesting a psychological basis for them, and in 2006 found severe psychiatric symptoms.  Tr. 746.  This is consistent with Dr. Noparstak's suspicion in 1994 that Pinkerton's physical problems were somatic manifestations of his PTSD (Tr. 793), Dr. Glasser's advice to Pinkerton in 2002 that a somatization disorder had to be considered (Tr. 689), Dr. Northway's

diagnosis in 2003 of a Pain Disorder (Tr. 702), and Dr. Mitchell's conclusion in 2003 that

multiple somatic complaints "probably reflect emotional issues" (Tr. 794). Thus, the issue is

whether the record supports the ALJ's additional decision to reject Pinkerton's testimony of

debilitating physical limitations and mental health limitations over and above those found by the

state agency medical consultants in May 2002 (Exhibit 13F, page 3, Tr. 647).

      The ALJ found Pinkerton not credible concerning the alleged extent of his disability

since February 2002 based on: (1) his failure to remember the details of his service in the Gulf

War (Tr. 16, citing failure to remember details of his unit, including the names of commanding

officers, non-commissioned officers, or locations); (2) discrepancies between Pinkerton's reports

of his serious injuries during his military service and information about which the ALJ took

administrative notice, including the lack of "contemporaneous records of treatment of any

conditions in Saudi Arabia or in Iraq" despite "the presence of ample medical personnel in the

region" (Tr. 17); (3) his "No" answers in the Southwest Asia Demobilization/Redeployment

Medical Evaluation to questions about whether he had recurring thoughts about his experiences

during Desert Shield/Desert Storm and whether he had reason to believe he had been exposed to

chemical or germ warfare (Tr. 17); and (4) notations in physical and mental health exam charts

raising "significant credibility issues" (Tr. 18). The chart notes cited by the ALJ include: (1) a

June 14, 1993 chart note by Dr. Patterson (Tr. 320) pointing out the inconsistency in Pinkerton's

statements that he "heard everything go crunch" during a driving accident and that he was

knocked out at the time of impact, and noting that the jerking of Pinkerton's head "appears more

prominent when [Pinkerton is] being questioned about it and less prominent when distracted"

(Tr. 320); (2) a June 28, 1993 chart note by Dr. F.W. Kirk, DDS, noting that a dental "flipper"

which Pinkerton claimed had been replaced while he was in Saudi Arabia "looks older than that, plus it has been repaired at least one time because of a broken tooth out of it" (Tr. 19); and (3) an October 24, 1996 chart note from a compensation and pension PTSD examination in which Pinkerton reportedly gave "sketchy and vague accounts in general" about his military experiences and in which the examiner noted that Pinkerton's description of his multiple military assignments could not be true since the entire period of military service was only about six months (Tr. 19 & 744).  The ALJ also pointed out multiple contradictions in Pinkerton's accounts of his:  (1) medical treatment during his overseas military duty; (2) exposure to chemicals while in Iraq; (3) witnessing of deaths of other soldiers while in Iraq; (4) educational background; (5) wartime awards; and (6) use (or lack thereof) of illicit drugs and alcohol.  Tr. 24-25.

Although the record supports these numerous contradictions by Pinkerton since 1991, the ALJ did not address their cause and, in particular, the possibility that they could stem from having a bad memory.  As noted by Dr. Turner, one of the diagnostic criteria for PTSD is evidence of gross memory losses and cognitive impairments.  Tr. 980 (citing C Cluster of DSM IV symptoms).  It is noteworthy that in January 2003, Dr. Northway questioned Pinkerton's honesty, as did the ALJ, but he "strongly recommended" a "more thorough neuropsychological evaluation," including tests with validity and personality measures.  Tr. 701.  The record does not reveal that such tests were ever administered.

The record does contain a notation of Pinkerton's admission that he has a "problem [with] telling lies" and a reference to Pinkerton wondering if his own observations of his father (reportedly a Vietnam veteran with PTSD) experiencing flashbacks might be influencing his own

behavior. Tr. 605-06. However, neither the ALJ nor any medical provider concluded that Pinkerton was malingering. To the contrary, the record contains substantial evidence that Pinkerton was trying to return to work. He worked as a truck driver between the summer of 1991 and 1996 when he was granted DIB. Tr. 319. By his own account, Pinkerton resumed working in September 1997 (Tr. 319), which resulted in the termination of his DIB benefits in October 2000 (Tr. 16). Had he wished to continue receiving DIB, he would not have resumed working. But he continued working off and on until February 2002, when he alleges that increasing pain and associated weakness in his joints, including his upper and lower extremities made it dangerous for him to drive. It appears from his work record that he was often off work or terminated for medical reasons, yet he continued to try and work for quite awhile. On February 20, 2002, he expressed great concern about not being able to continue working. Tr. 406. He also told Dr. Mace in April 2002 that he wanted to return to work. Tr. 376-77. An expressed desire to work is certainly not the reaction of a malingerer and counters, at least to some extent, any assumption that Pinkerton intentionally lied to his medical providers or the ALJ in order to obtain DIB.

The ALJ apparently concluded that because Pinkerton had lied, he was not credible as to any of his testimony concerning the severity of his physical or mental symptoms. Yet the record raises the question as to whether or not that lack of credibility means that Pinkerton suffers from no physical or mental impairment, as the ALJ believed, or is symptomatic of some mental impairment that, in turn, creates significant physical symptoms, as discussed more fully below. The ALJ did not attempt to answer that question. Therefore, his finding that Pinkerton is not credible does not necessarily support the conclusion that Pinkerton is not disabled.

///

///

///

### b.  Rejection of the Testimony of Pinkerton's Wife

Pinkerton also argues that the ALJ improperly rejected the testimony of his wife.

Pinkerton married in May 1992.  Tr. 48, 110.  His wife is a homemaker and they have three children.  Tr. 48-49.  Mrs. Pinkerton testified that she does "everything" for Pinkerton, including helping him walk, get to the bathroom, take showers, keep clean, and take his medications.  Tr. 110, 114.  She cooks for him and performs all the household tasks.  Tr. 110, 114.  Although he "tries as hard as he can," to walk, he will fall down and his wife takes him for walks in a wheelchair.  Tr. 110, 115.  Pinkerton sleeps a lot, and uses a computer, but gets frustrated easily and "explodes at things that would be very tedious to normal people."  Tr. 111. These explosive outbursts can last anywhere from five minutes to "all day depending on the circumstance" (*id*), and involve Pinkerton cussing, swearing, throwing things, ranting and raving, and making threats.  "Anything" can triggers these outbursts, including someone looking at Pinkerton wrong or not driving as he thinks they should.  Tr. 111, 113.

If his children do something they are not supposed to do, Pinkerton yells at them (Tr. 113) and Mrs. Pinkerton never leaves Pinkerton alone with them because he is "very short-tempered with them."  Tr. 112.  Mrs. Pinkerton is either with her husband, or has another adult with him, at all times.[7]  She does not leave him alone because she "never know[s] what he's

---

[7] Mrs. Pinkerton testified that there was another adult (an 18 year old) who had been living with them for about a month prior to the hearing whom she occasionally left with Pinkerton.  Tr. 111, 117.

going to do" and he "can get very violent."  Tr. 112.  He has periodically gotten into physical

altercations with other people which she has gotten "in the middle of" and ended up hurt.  *Id*.

On one such occasion, Pinkerton was trying to kill himself, "hollering and screaming out in the

street like a crazy person."  *Id*.

Pinkerton stays home most of the time and has only "a couple" of friends that come over

to visit him.  Tr. 113.  Although Pinkerton has had a problem with his temper ever since she has

known him, this problem got markedly worse after Pinkerton quit working.  Tr. 113, 115.

Pinkerton is "not a functional normal human being anymore," and he "doesn't actually really

want to be alive most of the time," and talks about how "he wish[es] he would've died over there

[in Iraq] rather than have to come back."  Tr. 115.

The ALJ found the testimony of Mrs. Pinkerton "not fully credible as it is based on the

claimant's presentation of symptoms, which is not credible," and noted that it was "appropriate

to consider her observations in the context of the entire factual record and to defer to the

extensive medical and mental health record in determining the nature and extent of alleged

physical and psychological limitations."  Tr. 25.  Although the ALJ's reasoning on this point is

somewhat cryptic, it is clear that he found Mrs. Pinkerton's testimony at odds with the

information in Pinkerton's medical and mental health records and deferred to those records to

assess the extent of Pinkerton's limitations.  The ALJ found no evidence of an underlying

medical impairment that would support the extreme limitations to which she testified or

Pinkerton's use of a wheelchair.

The record reveals mental health issues causing a variety of somewhat bizarre and

emotional behavior over the course of the 15 years since Pinkerton has been out of active

military service.  Irrespective of whether those behaviors are the result of PTSD (a conclusion

the ALJ rejected) or one of the many other mental health diagnoses reflected in the record

(explosive personality disorder, adjustment disorder, cognitive disorder NOS, *etc.*), the medical

records do reflect debilitating mental health issues, as well as physical symptoms, similar to

those identified by Mrs. Pinkerton.  It supports Dr. Northway's opinion that Pinkerton has

significant deficits in social functioning with marked limitations in his ability to interact

appropriately with the general public and with supervisors.  Tr. 702-04.  It also is consistent with

Dr. Turner's observations of Pinkerton in 1996 (Tr. 791-92) which informed his later opinion in

2003.

An ALJ cannot reject lay witness testimony solely because he has found the claimant not

credible.  *Dodrill*, 12 F3d at 918.  Yet this is the only reason given by the ALJ.  Based on

observations by medical providers consistent with Mrs. Pinkerton's observations of her

husband's volatility, the ALJ erred by rejecting Mrs. Pinkerton's testimony based on husband's

lack of credibility.

### B.  Opinions of Examining Physicians

#### 1.  Legal Standard

The ALJ may reject an examining physician's opinion that is inconsistent with the

opinions of other treating or examining physicians if the ALJ makes "findings setting forth

specific, legitimate reasons for doing so that are based on substantial evidence in the record."

*Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002) quoting  *Magallanes v. Bowen*, 881 F2d

747, 751 (9th Cir 1989); *Lester v. Chater*, 81 F3d at 830.  An uncontradicted opinion may be

rejected for clear and convincing reasons.  *Thomas*, 278 F3d at 956-57.  Moreover, in a social

security disability benefits case, a physician's opinion of disability, premised to a large extent upon the claimant's own accounts of his symptoms and limitations, may be disregarded where those complaints have been properly discounted. *Brawner v. Secretary of Health & Human Servs.*, 839 F2d 432, 433-34 (9th Cir 1988); *see also Lawson v. Massanari*, 231 F Supp 2d 986 (D Or 2001).

### 2. <u>Analysis</u>

Pinkerton argues that the ALJ improperly rejected the opinions of examining mental health providers. The record reveals that Pinkerton has undergone three mental health examinations since the alleged onset of his disability in February 2002, namely: (1) an April 30, 2002 examination by Dr. Mace, a psychologist (Tr. 376-80); (2) a January 21, 2003 psychodiagnostic assessment by Dr. Northway, a psychologist (Tr. 697-702); and (3) a March 17, 2003 examination by Dr. Turner, a clinical psychologist (Tr. 1033-37). In addition, he was examined an April 3, 2003 by Dr. Mitchell, a VA staff physician. Tr. 1039. The ALJ specifically rejected the opinions of Drs. Mace, Northway and Turner to the extent that they suggested limitations beyond those found by the state mental health examiner in May 2002 (Tr. 647). Because these medical providers each examined Pinkerton and issued uncontradicted opinions, the ALJ was required to provide clear and convincing reasons for rejecting them.

With respect to Dr. Mace's report, ALJ found that it:

> is, at best, inconclusive, and also relies on the claimant's description of experiences in the Gulf War, including exposure to chemicals and being involved in body removals. To the extent Dr. Mace's report supports a finding of disability, the [ALJ] does not accept such a conclusion as the psychologist's opinion would not have an adequate factual or clinical basis.

Tr. 21.

The ALJ is correct that Dr. Mace substantially relied on Pinkerton's self-reporting and wrote an inconclusive report. However, the ALJ fails to note that Dr. Mace also administered two tests and reviewed Pinkerton's VA disability report file. After noting "atypical" medical problems, Dr. Mace recommended further review by a neurologist, as well as a medical, neurological, and neuropsychological screening "in order to differentiate possibilities." Tr. 380. In other words, Dr. Mace, as did all other medical providers, concluded that Pinkerton had some psychological and/or neurological problem that needed a further evaluation to properly diagnose. The ALJ failed to explain why he rejected this portion of Dr. Mace's report.

With respect to Dr. Northway, the ALJ pointed out that Dr. Northway "noted certain inconsistencies" in the history presented by Pinkerton to others, such that his "level of honesty was somewhat difficult to determine." Tr. 22. The ALJ rejected Dr. Northway's diagnosis, explaining:

> [I]t is evident that despite his expressed doubts, Dr. Northway accepted the claimant's allegations in arriving at the diagnosis and in setting the GAF at 50. Dr. Northway found marked limitations in interacting appropriately with the public or with supervisors; his opinion with respect to the GAF score and marked limitations is not accepted, as it is based on the claimant's subjective complaints, which are not fully credible.

Tr. 23.

As discussed above, the ALJ inappropriately reached the conclusion that because Pinkerton was not credible, his subjective complaints should be ignored. But even if Pinkerton's credibility is suspect, Dr. Northway not only relied on Pinkerton's self-reporting, but also examined and tested Pinkerton. He noted that Pinkerton's affect was "somewhat limited" and

33 - OPINION AND ORDER

that he was easily agitated.  Tr. 700.  He appeared quite rigid and was at times quite dramatic in

his presentation.  *Id*.  He never smiled, appeared irritated at questioning, and had difficulty with

some of the mental status testing.  *Id*.  The mental status testing revealed "some significant

deficits" with impairment in attention, concentration, vigilance, abstract thinking, mental math

and memory.  Tr. 701.  The ALJ fails to address these findings.

As the ALJ correctly noted, Dr. Northway found it difficult to assess Pinkerton's honesty.

However, the ALJ failed to note that Dr. Northway had "strongly recommended" a more

thorough neuropsychological evaluation (Tr. 701), which apparently was never done.  "In Social

Security Cases, the ALJ has a special duty to fully and fairly develop the record and to assure

that the claimant's interests are considered."  *Brown v. Heckler*, 713 F2d 441, 443 (9th Cir 1983).

This duty exists even when the claimant is represented by counsel.  *Id*.  Rejecting Dr.

Northway's opinion based solely on Pinkerton's lack of credibility is simply not a clear and

convincing reason.

Finally, the ALJ rejected the portions of the March 17, 2003 assessment by Dr. Turner

because Dr. Turner did not have Pinkerton's entire medical record, was given a more disturbing

account of Pinkerton's wartime stressor exposure than reflected in the record, and relied heavily

on the subjective complaints by Pinkerton:

> [Pinkerton] described exposure to bodies in Iraq that exceeded any
> descriptions in earlier reports to doctors or in his testimony.  While
> the doctor indicated that a diagnosis was Rule Out [PTSD],
> moderate to severe, immediate onset, it was noted in a
> parenthetical phrase: "(verification of stressors from Gulf War)."
> Moreover, this psychologist . . . indicated that "prior C&P reports
> were unavailable from inspection of the C-record, including prior
> reports, which did not support a PTSD diagnosis.  To the extent
> that this report supports a finding of disability as such an opinion

                    would have heavily relied on the claimant's subjective complaints,
                    which are not credible.

Tr. 23.

However, Dr. Turner examined Pinkerton in both 1996 and 2003 and relied on more than simply Pinkerton's subjective complaints.  In his 1996 examination, Dr. Turner noted that Pinkerton demonstrated lethargic motor behavior and no eye contact.  Tr. 745.  His ability to respond meaningfully and provide data was very erratic.  *Id.*  His thinking appeared quite confused and his judgment appeared to have been poor for years.  *Id.*  In 2003, Dr. Turner thoroughly reviewed Pinkerton's medical and military records.  Tr. 975.  He also examined Pinkerton, noting that testing revealed a cognitive impairment and very clouded thought processes.  Tr. 979.  Memory functions were compromised and speech was halting and highly variable in volume.  *Id.*  There was evidence of a thought disorder with documentation of frankly paranoid ideation.  *Id.*  In sum, Dr. Pinkerton detailed observations of Pinkerton's behavior and thought processes, as well as mental status testing and a review of records, support his conclusion of a severe mental illness.  Contrary to the ALJ's finding, Dr. Turner did not "heavily" rely on Pinkerton's subjective complaints.

The ALJ failed to consider that the findings of Drs. Mace, Northway and Turner are consistent with the evaluations performed by two psychiatrists (Drs. Theel and Noparstak) in 1993 and 1994 who found Pinkerton to be severely disabled vocationally and socially.  Although Pinkerton's condition improved sufficiently to return to work, the opinions of the medical providers after February 2002 are consistent with a long history of severe mental illness.

In addition, the ALJ failed to address the substantial evidence in the record supporting a diagnosis of a Somatization Disorder or Pain Disorder which affects Pinkerton's presentation. Tr. 689, 702, 746, 793-94.  This issue was raised not only by Drs. Northway and Turner, but also by three other medical providers (Drs. Noparstak, Glasser and Mitchell, the last physician to examine Pinkerton) who considered that Pinkerton's physical limitations could be manifestations of such psychological problems.

Accordingly, this court concludes that the ALJ failed to provide clear and convincing reasons to reject the medical opinions of Drs. Mace, Northway and Turner and, therefore, erred in his RFC analysis.

## II.  Ability to Perform Past Work or Other Work

### A.  Legal Framework and Standard

For information about the requirements of work, the Commissioner relies primarily on the Department of Labor publication *Dictionary of Occupational Titles* ("DOT") including its companion publication, *Selected Characteristics of Occupations*.  20 CFR Part 404, Subpart P, Appendix 2 200.00(b); *see also* SSR 00-4p.  The ALJ may utilize a VE to provide more specific information.  SSR 00-4p.

In steps Four and Five, the Commissioner must determine whether the claimant retains the RFC to perform his past relevant work (Step Four) and, if not, then the Commissioner (at Step Five) must show that the claimant can do other work which exists in the national economy. The Commissioner can satisfy this burden by eliciting the testimony of a vocational expert with a hypothetical question that sets forth all the limitations of the claimant.  *Andrews*, 53 F3d at

1043.  The assumptions in the hypothetical question must be supported by substantial evidence. *Id.*

When a VE provides information about the requirements of an occupation, the ALJ has an affirmative duty to determine whether that information conflicts with the DOT and to obtain a reasonable explanation for the apparent conflict.  The ALJ must resolve the conflict before relying on the testimony to find that a claimant is not disabled and must explain how the conflict was resolved.  SSR 00-4p.  An ALJ may rely on expert testimony which contradicts the DOT, but only if the record contains persuasive evidence to support the deviation.  *Johnson v. Shalala*, 60 F3d 1428, 1435 (9th Cir 1995).

**B.  Analysis**

The ALJ concluded that Pinkerton retained the RFC to perform his past work as a truck driver.  Tr. 28.  The ALJ then proceeded on to Step Five and made the alternative finding that claimant could perform 25% of the jobs as a "sweeper/cleaner" (those in which the building he was working were shut down and empty) (medium work, unskilled, DOT 389.683-010), a bench assembler (light work; unskilled, DOT 706.684-042), and as a sedentary assembler (sedentary work; unskilled, DOT 734.687-018).  Tr. 28.

Pinkerton contends that the ALJ failed to meet his burden of establishing that there is other work in the national economy that he could perform.  With regard to the physical limitations, the ALJ concluded that they simply were not supported by sufficient objective evidence of any underlying impairment that could impose the degree of limitations alleged by Pinkerton.  The ALJ also discounted the testimony of debilitating mental impairments based on his credibility findings concerning Pinkerton's testimony, the conflict in the medical records

concerning the nature and degree of Pinkerton's mental health issues, and Pinkerton's long work

history both before and after his previous award of disability benefits.

However, as discussed above, the ALJ improperly discredited the testimony of Pinkerton

and his wife concerning the severity of Pinkerton's limitations imposed as a result of his

impairments and also provided inadequate reasons to reject the opinions of Drs. Northway and

Turner.  Based on those errors, the ALJ also erred in his alternative findings concerning

Pinkerton's ability to work.

**III.  Remand**

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court.  *Harman v. Apfel,* 211 F3d 1172, 1178 (9th Cir), *cert*

*denied,* 531 US 1038 (2000).  The court's decision turns on the utility of further proceedings.  A

remand for an award of benefits is appropriate when no useful purpose would be served by

further administrative proceedings or when the record has been fully developed and the evidence

is not sufficient to support the Commissioner's decision.  *Rodriguez v. Bowen,* 876 F2d 759, 763

(9th Cir 1989).

The Ninth Circuit has established a three-part test "for determining when evidence should

be credited and an immediate award of benefits directed."  *Harman,* 211 F3d at 1178.  The court

should grant an immediate award of benefits when:

> (l)  the ALJ has failed to provide legally sufficient reasons for
> rejecting such evidence, (2) there are no outstanding issues
> that must be resolved before a determination of disability can
> be made, and (3) it is clear from the record that the ALJ would
> be required to find the claimant disabled were such evidence
> credited.

*Id.*

The second and third prongs of the test often merge into a single question:  whether the ALJ would have to award benefits if the case were remanded for further proceedings.  *See id* at 1178 n7.

///

In this case, although the ALJ failed to give legally sufficient reasons for rejecting the testimony of Mrs. Pinkerton, there is no basis for an immediate award of benefits.  Instead, a thorough review of the record reveals an unresolved issue, namely relationship between Pinkerton's physical symptoms and his multiple diagnoses of mental disorders.  While the record supports the ALJ's conclusion that PTSD was not the source of Pinkerton's symptoms, it nevertheless reveals significant limitations on Pinkerton's functioning and clearly suggests that longstanding mental health issues are contributing to his physical and emotional limitations.

These issues cannot be resolved at this juncture. On remand, the Commissioner must reevaluate the credibility of Pinkerton and assess the testimony of Mrs. Pinkerton as corroboration of Pinkerton's testimony.  In addition, the Commissioner must reevaluate all opinions by the medical providers since February 2002, reevaluate Pinkerton's RFC and, if necessary, elicit testimony from the VE with a hypothetical question that accurately reflects all of Pinkerton's limitations.

## **ORDER**

Based on the reasons set forth above, the Commissioner's final decision is REVERSED and REMANDED pursuant to sentence four of 42 USC § 405(g) for further administrative proceedings in accordance with this Opinion.

DATED this 9th day of June, 2006.

/s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge